**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Victoza (liraglutide) Antitrust Litigation | C.A. No. 1:26-cv-420-BMC |
| This Document Relates To:<br>ALL ACTIONS | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THE
MOTION TO DISMISS THE COMPLAINTS PURSUANT
TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 4

      A.       Regulatory Framework ..................................................................... 4

      B.       Victoza ............................................................................................ 6

      C.       Generic Equivalents of Victoza......................................................... 6

      D.       Ozempic .......................................................................................... 8

      E.       Plaintiffs' Claims............................................................................. 9

LEGAL STANDARD .................................................................................................. 10

ARGUMENT .............................................................................................................. 10

I.      PLAINTIFFS FAIL TO PLAUSIBLY PLEAD A SHERMAN ACT SECTION 2 MONOPOLIZATION CLAIM ........................................................................ 10

      A.       Plaintiffs Fail To Plausibly Plead Anticompetitive Conduct. ............................. 10

              1.       Patent Litigation Settlement with Teva ....................................... 11

              2.       Orange Book Listings ................................................................. 15

              3.       "Bottle-Necking" ...................................................................... 18

              4.       Settlements with Other Generics ................................................ 22

              5.       "Switching" Victoza to Ozempic ................................................ 23

      B.       Plaintiffs Fail To Plausibly Plead Monopoly Power. ............................................. 24

      C.       Plaintiffs Fail To Plausibly Plead Antitrust Injury. .............................................. 27

II.     EPPs' STATE LAW CLAIMS MUST BE DISMISSED .................................................. 29

      A.       The State Law Claims Fail for the Same Reasons as the Federal Claims. ........... 29

      B.       EPPs' Cursory and Threadbare Allegations Are Insufficient to Support the State Law Claims. ........................................................................................... 29

      C.       Many State Law Claims Must be Dismissed for Other Reasons. ........................ 31

| | | |
|---|---|---|
| 1. | State Antitrust Claims | 31 |
| 2. | State Consumer Protection Claims | 33 |
| 3. | State Unjust Enrichment Claims | 35 |

CONCLUSION .......................................................................................................... 40

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Actos End-Payor Antitrust Litig.*,
  848 F.3d 89 (2d Cir. 2017).........................................................................................16, 17

*In re Actos*,
  2015 WL 5610752 (S.D.N.Y. Sept. 22, 2015).......................................14, 17, 27, 30

*In re Aggrenox Antitrust Litig.*,
  94 F. Supp. 3d 224 (D. Conn. 2015).....................................................................30, 34, 35

*In re Aluminum Warehousing Antitrust Litig.*,
  833 F.3d 151 (2d Cir. 2016).....................................................................................30

*Apotex, Inc. v. Daiichi Sankyo, Inc.*,
  781 F.3d 1356 (Fed. Cir. 2015)................................................................................20

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
  802 F. Supp. 2d 1070 (N.D. Cal. 2011) ................................................................39

*In re Asacol Antitrust Litig.*,
  233 F. Supp. 3d 247 (D. Mass. 2017) ..........................................................24, 28, 34

*Asahi Glass Co. v. Pentech Pharms., Inc.*,
  289 F. Supp. 2d 986 (N.D. Ill. 2003) ....................................................................10

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*,
  138 Cal. Rptr. 3d 620 (Cal. Ct. App. 2012) .........................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................10, 22, 29, 30

*In re Auto. Parts Antitrust Litig.*,
  2018 WL 1135504 (E.D. Mich. Jan. 16, 2018)....................................................33

*Bayer Schering Pharma AG v. Sandoz*,
  813 F.Supp.2d 569 (S.D.N.Y. 2011)......................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................10, 22, 29, 30

*Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*,
  353 F. Supp. 3d 1070 (D. Colo. 2018)....................................................................35

*In re Bystolic Antitrust Litig.*,
  583 F. Supp. 3d 455 (S.D.N.Y. 2022).....................................................................30

*In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*,
    2015 WL 5166014 (E.D. Tenn. June 24, 2015)................................................................33

*City of Groton v. Conn. Light & Power Co.*,
    662 F.2d 921 (2d Cir. 1981)..............................................................................................11

*Cole v. NIBCO, Inc.*,
    2015 WL 2414740 (D.N.J. May 20, 2015)..................................................................37, 38

*Commonwealth Elec. Inspection Servs. v. Town of Clarence*,
    776 N.Y.S.2d 687 (N.Y. App. Div. 2004) .......................................................................32

*In re Ditropan XL Antitrust Litig.*,
    529 F. Supp. 2d 1098 (N.D. Cal. 2007) ...........................................................................32

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*,
    486 Fed. Appx. 186 (2d Cir. 2012).................................................................................11

*In re Estate of Johnson v. Adkins*,
    513 So. 2d 922 (Miss. 1987).............................................................................................39

*In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*,
    2006 WL 2632328 (E.D. Mo. Sept. 13, 2006)................................................................34

*F.T.C. v. Watson Pharms., Inc.*,
    677 F.3d 1298 (11th Cir. 2012) .................................................................................20, 21

*Fenerjian v. Nongshim Co., Ltd.*,
    72 F. Supp. 3d 1058 (N.D. Cal. Nov. 4, 2014) ...............................................................38

*In re Flonase Antitrust Litig.*,
    692 F. Supp. 2d 524 (E.D. Pa. 2010) ..........................................................................36, 37

*Frank v. Gold'n Plump Poultry, Inc.*,
    2007 WL 2780504 (D. Minn. Sept. 24, 2007).................................................................39

*Freeman Indus., LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005)..........................................................................................33

*FTC v. Actavis*,
    570 U.S. 136 (2013)..............................................................11, 13, 14, 21, 22, 23

*FTC v. Cephalon, Inc.*,
    2:08-cv-02141-MSG, ECF No. 410 (E.D. Pa. Feb. 21, 2019)..................................15

*Gen. Insulation Co. v. Eckman Constr.*,
    159 N.H. 601 (2010) ........................................................................................................39

*Gibson v. Bartlett Dairy, Inc.*,
  2022 WL 784746 (E.D.N.Y. Mar. 15, 2022) ........................................................................31

*Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*,
  969 N.E.2d 187 (N.Y. 2012) .................................................................................................32

*In re Humira (Adalimumab) Antitrust Litig.*,
  465 F. Supp. 3d 811 (N.D. Ill. 2020) ..............................................................................11, 31

*In re Interior'l Molded Doors Antitrust Litig.*,
  2019 WL 4478734 (E.D. Va. Sept. 18, 2019)......................................................................39

*Jones v. Mackey Price Thompson & Ostler*,
  355 P.3d 1000 (Utah 2015) ..................................................................................................38

*Kelly v. Beliv LLC*,
  640 F. Supp. 3d 286 (S.D.N.Y. 2022)..................................................................................31

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)..................................................................................33

*King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*,
  791 F.3d 388 (3d Cir. 2015).................................................................................................13

*Kopel v. Kopel*,
  229 So. 3d 812 (Fla. 2017)...................................................................................................37

*La. Health Serv. & Indem. Co. v. Celgene Corp.*,
  2025 WL 1056668 (S.D.N.Y. Apr. 8, 2025)....................................................................11, 29

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
  897 F.3d 88 (2d Cir. 2018)...................................................................................................30

*Licul v. Volkswagen Grp. of Am., Inc.*,
  2013 WL 6328734 (S.D. Fla. Dec. 5, 2013) ........................................................................39

*In re Lidoderm Antitrust Litig.*,
  103 F. Supp. 3d 1155 (N.D. Cal. 2015) ....................................................................34, 36, 38

*Linear Tech. Corp. v. Applied Materials, Inc.*,
  61 Cal. Rptr. 3d 221 (Cal. Ct. App. 2007).........................................................................34

*In re Loestrin 24 FE Antitrust Litig.*,
  410 F. Supp. 3d 352 (D.R.I. 2019)..........................................................................31, 36, 37, 38

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
  2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) .................................................................37, 38

iii

*Mayor and City of Balt. v. AbbVie*,
  42 F.4th 709 (7th Cir. 2022) ...........................................................................................23

*McBride v. Boughton*,
  123 Cal. Rptr. 3d 115 (Cal. Ct. App. 2004) ....................................................................39

*Melchior v. New Line Productions, Inc.*,
  131 Cal. Rptr. 2d 347 (Cal. Ct. App. 2003) ....................................................................39

*Meijer, Inc. v. Ranbaxy Inc.*,
  2016 WL 4697331 (D. Mass. June 16, 2016) ..................................................................21

*Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*,
  404 F. Supp. 2d 1214 (E.D. Cal. 2005)............................................................................35

*Miami Prods. & Chem. Co. v. Olin Corp.*,
  546 F. Supp. 3d 223 (W.D.N.Y. 2021) .......................................................................33, 34

*Mylan Pharms., Inc. v. Shalala*,
  81 F. Supp. 2d 30 (D.D.C. 2000) .....................................................................................19

*Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*,
  2015 WL 1736957 (E.D. Pa. Apr. 16, 2015) ...................................................................25

*N. Assur. Co. of Am. v. Bayside Marine Const., Inc.*,
  2009 WL 151023 (S.D. Ala. Jan. 21, 2009) ....................................................................39

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
  596 F.3d 112 (2d Cir. 2010)..............................................................................................15

*In re Novartis & Par Antitrust Litig.*,
  2019 WL 3841711 (S.D.N.Y. Aug. 15, 2019).................................................12, 13, 37, 38

*Novo Nordisk Inc. v. Teva Pharms. USA, Inc.*,
  No. 17-cv-00227-JFB-SRF, ECF No. 1 ...........................................................................18

*In re Opana ER Antitrust Litig.*,
  162 F. Supp. 3d 704 (N.D. Ill. 2016) ...............................................................................37

*In re Packaged Seafood Prods. Antitrust Litig.*,
  242 F. Supp. 3d 1033 (S.D. Cal. 2017).......................................................................34, 37

*In re Pork Antitrust Litig.*,
  495 F. Supp. 3d 753 (D. Minn. 2020)..........................................................................33, 38

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)..............................................................................................26

*Ranbaxy Lab'ys, Ltd. v. Burwell,*
    82 F. Supp. 3d 159 (D.D.C. 2015) ........................................................................20, 21

*In re Refrigerant Compressors Antitrust Litig.,*
    2013 WL 1431756 (E.D. Mich. Apr. 9, 2013) ...........................................................38

*Regeneron Pharms., Inc. v. Novartis Pharma AG,*
    96 F.4th 327 (2d Cir. 2024) .......................................................................................26

*Ruediger v. Sheedy (In re Ruediger's Estate),*
    264 N.W.2d 604 (Wis. 1978) .....................................................................................40

*New York ex rel. Schneiderman v. Actavis PLC,*
    787 F.3d 638 (2d Cir. 2015)................................................................23, 24, 32, 38

*In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.,*
    2022 WL 2438934 (D. Del. July 5, 2022) ..........................................................31, 36

*In re Solodyn Antitrust Litig.,*
    2015 WL 5458570 (D. Mass. Sept. 16, 2015) ...........................................11, 28, 31, 34

*Sperry v. Crompton Corp.,*
    863 N.E.2d 1012 (N.Y. 2007)....................................................................................38

*Staley v. Gilead Sciences*
    446 F. Supp. 3d 578, 642 (N.D. Cal. 2020) ..............................................................32

*State of N.Y. v. Mobil Oil Corp.,*
    344 N.E.2d 357 (N.Y. 1976).......................................................................................32

*Stutzle v. Rhone-Poulenc S.A.,*
    2003 WL 22250424 (Pa. Com. Pl. Sept. 26, 2003) ..............................................36, 38

*In re Tamoxifen Citrate Antitrust Litig.,*
    277 F. Supp. 2d 121 (E.D.N.Y. 2003) ..............................................................21, 22, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)......................................................................................................7

*Tops Markets, Inc. v. Quality Markets, Inc.,*
    142 F.3d 90 (2d Cir. 1998).................................................................................10, 24

*United Healthcare Servs., Inc. v. United Therapeutics Corp.,*
    2024 WL 1256266 (D. Md. Mar. 25, 2024)................................................................30

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016)........................................................................................25

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)..................................................................................................24

*Valassis Commc'ns, Inc. v. News Corp.*,
   2019 WL 802093 (S.D.N.Y. Feb. 21, 2019)..............................................................11

*In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*,
   2023 WL 2182046 (D.N.J. Feb. 23, 2022) ................................................................36

*Verizon Commc'ns v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004)..................................................................................................24

*Walgreen Co. v. AstraZeneca*,
   534 F. Supp. 2d 146 (D.D.C. 2008)...........................................................................24

*Watson Lab'ys, Inc. v. Forest Lab'ys. Inc.*,
   101 F.4th 223 (2d Cir. 2024) .........................................................14, 22, 23, 29, 30

*In re Xyrem Antitrust Litig.*,
   555 F. Supp. 3d 829 (N.D. Cal. 2021) ......................................................................13

**Statutes**

21 U.S.C. §§ 355.........................................................................5, 6, 16, 18, 19, 20

2003 Medicare Prescription Drug, Improvement, and Modernization Act ...................................19

Alaska Stat. Ann. § 45.50.531(a)...................................................................................33

Cal. Bus. & Prof. Code §§ 17200 *et seq.* .........................................................32, 33, 35

Cartwright Act ...............................................................................................................32

Federal Food, Drug, and Cosmetic Act ...........................................................................4

Fla. Stat. § 501.204(1)...................................................................................................35

Hatch-Waxman Act .................................................1, 3, 5, 6, 7, 12, 13, 15, 16, 19, 21

Ill. Comp. Stat. 10/7(2) .................................................................................................31

Inflation Reduction Act...................................................................................................27

Kan. Stat. Ann. § 50-101 ...............................................................................................32

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.
   L. No. 108-173, sec. 1102, § 355(j)(5), 117 Stat. 2066, 2457–2460 (2003) ..........................19

Mo. Ann. Stat. § 407.025...............................................................................................34

vi

Mont. Code Ann. §§ 30-14-102(1) ...................................................................................34

N.Y. Gen. Bus. Law § 340(1) .........................................................................................32

Sherman Act Section 2.............................................................................9, 10, 11, 24, 27

South Carolina Unfair Trade Practices Act ....................................................................34

Tenn. Code Ann. § 47-25-101 ........................................................................................32

Utah Code Ann. § 76-16-511(1)(a)(i) .............................................................................31

**Other Authorities**

21 C.F.R. § 314.94(a)(12)(i)(A)........................................................................................5

21 C.F.R. § 314.107(e) (1999)........................................................................................19

149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) ..................................................20, 21

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 7, 10

Fed. R. Civ. P. 7.1(c) .....................................................................................................40

Fed. R. Civ. P. 8..............................................................................................................30

Fed. R. Civ. P. 23(b)(3)...................................................................................................30

Defendants Novo Nordisk Inc. and Novo Nordisk A/S (collectively, "Novo Nordisk") submit this memorandum in support of their motion to dismiss the complaint of the Direct Purchaser Plaintiffs ("DPPs") and the two complaints of the End-Payor Plaintiffs ("EPPs") (collectively, the "Complaints")[1] pursuant to Federal Rule of Civil Procedure 12(b)(6).  As shown below, the Complaints should be dismissed in their entirety with prejudice.

## INTRODUCTION

Novo Nordisk—a healthcare company with a 100-year history of innovation in developing medicines to treat chronic diseases—has been at the forefront of researching, developing, and marketing breakthrough blockbuster treatments aimed squarely at the epidemic of diabetes and obesity that has impacted the United States.  Novo Nordisk's primary focus has been on naturally occurring hormones in the body that help regulate blood sugar, appetite, and digestion, known as Glucagon-Like Peptide-1s, or "GLP-1s."  The therapeutic benefit of this category of medicine has revolutionized the treatment of diabetes and obesity, and led to the development and marketing of a number of GLP-1s in the United States in the last 20 years by the largest and most well-known pharmaceutical companies in the world, including Novo Nordisk, Eli Lilly, Sanofi, and others. Novo Nordisk launched its first generation GLP-1 in the U.S. in 2010—a liraglutide-based product known as Victoza®—and its second generation GLP-1 in 2018—a semaglutide-based product known as Ozempic®.  Because both products became "blockbusters," they attracted the development of generic versions by a number of generic pharmaceutical companies.

The heart of Plaintiffs' cases is that, as part of the settlement of Hatch-Waxman patent litigation, Novo Nordisk paid generic manufacturer Teva Pharmaceuticals USA, Inc. ("Teva") to

---

[1] *See* DPP Complaint at ECF No. 1 in Case No. 1:26-cv-00420-BMC ("DPP. Compl.") and EPP complaints at ECF No. 1 in Case Nos. 1:26-cv-01300-BMC and 1:26-cv-02458.  The two EPP complaints—which have substantially similar allegations—are consolidated.  ECF. Nos. 36, 45.

delay entry of the first generic version of Victoza. Novo Nordisk allegedly made a "payment" to Teva in the form of an "exclusive" license to launch an authorized generic ("AG") version of Victoza and an alleged agreement that Novo Nordisk would not launch or license further Victoza AGs. In other words, Plaintiffs claim that as part of the settlement, Novo Nordisk "agree[d] . . . not to launch a competing generic." DPP Compl. ¶66.

Unfortunately for Plaintiffs, their allegations are directly contrary to the Settlement. The Settlement explicitly provides that Novo Nordisk ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ Thus, contrary to Plaintiffs' assertion that the agreement contained an unlawful payment to Teva to delay the entry of Teva's generic version of Victoza in violation of the Sherman Act, the agreement achieved the demonstrably procompetitive result of ensuring generic competition for Victoza irrespective of whether Teva had FDA approval for its product as of the licensed entry date of June 22, 2024. Indeed, as the Complaints allege, Teva did not receive FDA approval for its product by that date, and the Settlement nonetheless allowed Teva to launch with an AG version of Victoza.

Plaintiffs' other allegations, which in reality are nothing more than window-dressing, do not state an actionable antitrust claim. *First*, Plaintiffs' Orange Book listing allegations are fundamentally implausible because Plaintiffs do not allege that Novo Nordisk improperly listed U.S. Patent No. 6,268,343 (the "'343 patent"), entitled "Derivatives of GLP-1 Analogs," and U.S. Patent No. 8,144,833 (the "'833 patent"), entitled "Propylene Glycol-Containing Peptide

2

Formulations Which Are Optimal for Production and For Use in Injection Devices," in the Orange Book.  Without an allegation that these patents were improperly listed, Plaintiffs cannot state an actionable antitrust claim based on Novo Nordisk's supposed improper Orange Book listings.  In other words, it only takes one properly-listed patent to trigger the Hatch-Waxman Act's automatic 30-month stay of FDA approval of a generic application and that is precisely what Plaintiffs have pleaded occurred here.

*Second*, Plaintiffs' assertion that the Settlement with Teva "parked" Teva's first-filer 180-day exclusivity—thereby "bottle-necking" the approval of subsequent generic filers—ignores the applicable regulatory regime.  Congress amended the Hatch-Waxman Act in 2003 to expressly remove the ability of manufacturers to engage in so-called "bottle-necking."  Courts have repeatedly recognized that an antitrust violation can no longer be based on "bottle-necking" allegations because the whole point of the amendments was to ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used to prevent additional generic competition.  Thus, Plaintiffs' antiquated "bottle-necking" allegations do not state an actionable antitrust claim in light of the current regulatory regime.

*Third*, Plaintiffs do not even attempt to meet the controlling Supreme Court standard to plead that Novo Nordisk's settlements with the subsequent generic filers included any large and unjustified payments by Novo Nordisk that could subject those settlements to antitrust scrutiny.  Thus, Plaintiffs do not state a plausible antitrust claim as to those settlements.  And likewise, Plaintiffs come nowhere close to asserting an actionable "product hop" from Victoza to Ozempic.  Case law clearly rejects such a claim where, as here, there is no allegation that Novo Nordisk withdrew Victoza.

3

At bottom, Plaintiffs engage in a classic effort by an antitrust plaintiff to attempt to plead a multi-part "scheme" that they hope will somehow survive this motion. But, courts have established well-accepted standards for judging whether the challenged conduct is a violation of the antitrust laws. In such situations, courts routinely reject attempts by antitrust plaintiffs to claim that a "scheme" can be an antitrust violation even if the parts of the scheme individually are not themselves unlawful. That is the conclusion the Court should reach here—zero plus zero equals zero.

*Fourth*, the Complaints' deficiencies are not limited to the "conduct" element of a monopolization claim. Plaintiffs' allegations preclude a plausibility finding on two other required elements: that Novo Nordisk has monopoly power over a properly defined relevant market or that the alleged conduct caused antitrust injury.

*Finally*, EPPs' claims under state antitrust and consumer protection statutes and unjust enrichment laws fail for the same reasons as the federal claims and for additional, state-specific reasons.

## FACTUAL BACKGROUND

### A.    Regulatory Framework

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), pharmaceutical companies looking to launch a new product in the U.S. must file a New Drug Application ("NDA") with the FDA. DPP Compl. ¶25.[2] In addition to safety and efficacy data, an NDA applicant must submit information to the FDA on each patent that claims "the drug" or "a method of using such drug" described in the NDA for which "a claim of patent infringement could reasonably be asserted if a

---

[2] Defendants cite to the DPP complaint throughout this Motion for the overlapping allegations across the three complaints. Where Defendants must address the EPP complaints (particularly Section II), Defendants cite the first complaint (Case No. 1:26-cv-01300-BMC) ("EPP Complaint"), which is substantially similar to the second complaint.

person not licensed by the owner . . . engaged in the manufacture, use, or sale of the drug." *Id.* ¶26; 21 U.S.C. §§ 355(b)(1), (c)(2). The FDA then lists the applicant's patents in the Orange Book, which listing can trigger regulatory actions when a generic manufacturer wishes to sell a generic version of the underlying drug product. *Id.* ¶¶27, 30.

The Hatch-Waxman Act allows a generic manufacturer to file an Abbreviated New Drug Application ("ANDA") with the FDA for an approved NDA drug. *Id.* ¶34. This regulatory pathway is "abbreviated" because a generic manufacturer only needs to show that its generic formulation is pharmaceutically equivalent and bioequivalent to the brand-name drug, among other requirements. *Id.*; 21 U.S.C. § 355(j)(2)(A). A generic manufacturer must also address each patent listed in the Orange Book covering the drug. *Id.* ¶36. For each Orange Book–listed patent, the ANDA filer must either make one of four certifications or agree to carve out from its labeling the patent-protected information. *Id.* The certification relevant here—known as a "Paragraph IV" certification—is available to a generic manufacturer that wants to market its generic version before the expiration date of the Orange Book–listed patent(s) and can claim that such patent(s) is invalid, unenforceable, or will not be infringed by the manufacture, use, or sale of the generic drug for which the application is submitted. *Id.* ¶37; 21 U.S.C. § 355(j)(2)(A)(vii)(I)–(IV); 21 C.F.R. § 314.94(a)(12)(i)(A).[3]

An ANDA applicant that files a Paragraph IV certification must notify the NDA holder and the patent owner. *Id.* ¶¶38–39. An NDA holder who files a lawsuit within 45 days of receiving the Paragraph IV notice automatically triggers a 30-month stay of FDA approval of the ANDA

---

[3] The other three certifications are as follows: (I) that such patent information has not been filed; (II) that such patent has expired; or (III) that the generic applicant does not seek to market its generic version of the reference listed drug until the date on which such patent will expire. 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(III).

application. *Id.* The first generic manufacturer to file an ANDA with a Paragraph IV certification is eligible to obtain 180 days of exclusivity. *Id.* ¶¶41–44. This exclusivity can be forfeited under certain circumstances under the regulatory regime, including if the first-filer fails to launch after the court enters a final judgment that the patent is invalid or not infringed by the ANDA applicant's proposed product. *Id.* ¶45; 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA).

### B.    Victoza

In January 2010, Novo Nordisk received FDA approval of its NDA for Victoza, a GLP-1 whose active ingredient, liraglutide, is self-administered by the patient through a subcutaneous injection pen that delivers pre-set doses. *Id.* ¶77–78. Originally indicated "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes," Novo Nordisk later secured FDA approval for the additional indication "to reduce the risk of major adverse cardiovascular events in adults with type 2 diabetes . . . and established cardiovascular disease." *Id.* ¶77. A clinically documented side-effect of Victoza at the time of FDA approval—weight loss—allegedly played a role in Victoza sales surpassing $4 billion by 2018. *Id.* ¶172.

Novo Nordisk has obtained patents for the novel aspects of Victoza, and submitted patents for listing in the Orange Book, including the '343 patent and U.S. Patent Nos. 6,458,924 and 7,235,627 ("Derivatives of GLP-1 Analogs") and 8,846,618 ("Stable Formulation of Modified GLP-1"). *Id.* ¶81. After obtaining initial FDA approval, Novo Nordisk listed additional patents in the Orange Book, including the '833 patent. *Id.* ¶¶81–88. The '343 patent and '833 patent expired on February 22, 2023 and February 13, 2026, respectively. *Id.* ¶¶82, 88, 89.

### C.    Generic Equivalents of Victoza

Teva was the first generic manufacturer to submit an ANDA for Victoza. *Id.* ¶93. In March 2017, Novo Nordisk filed a lawsuit against Teva pursuant to the Hatch-Waxman Act, alleging that Teva's ANDA product would infringe the '833, '956, '893, '618 and '343 patents. *Id.* ¶¶94–95.

6

This lawsuit triggered the automatic 30-month stay of final FDA approval of Teva's ANDA product under the Hatch-Waxman Act. *Id.* Teva initially counterclaimed for declarations of invalidity and non-infringement as to all five patents but later stipulated to infringement of the '618 and '343 patents. *Id.* ¶¶96–97.

Teva and Novo Nordisk settled on March 18, 2019 before trial on the remaining patents. *Id.* ¶¶99–101. The Settlement and License Agreement (the "Settlement") provided Teva a license to the patents starting no later than June 22, 2024[4]—16 months before the '833 patent expired and nine years before the last patent was set to expire. *Id.* ¶¶88, 100, 105, 107; Ex. 1, Sec. 3.02.[5] The Settlement further provided that



---

[4] The agreement provided for launch on December 22, 2023 or in June 2024 if FDA granted pediatric exclusivity for Victoza (which FDA did). DPP Compl. ¶¶105–06.

[5] "Ex. 1" refers to the Teva Settlement, attached as Exhibit 1 to the Declaration of Kathryn Jones, submitted herewith. The Court may consider the Settlement because it is incorporated by reference in the Complaints. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

[6]

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Other generic manufacturers filed ANDAs for Victoza as well. Novo Nordisk filed suits asserting infringement of the '833 patent and other patents against 11 subsequent ANDA filers. *Id.* ¶¶119–120, 135–38, 154–58. During these litigations, no court found that the '833 patent or any other asserted patents were invalid, nor did any court find non-infringement of these patents. *Id.* ¶¶130–31, 148–50, 156, 158. Nor do the Complaints allege that any generic manufacturer was sufficiently confident of success in the litigations to consider an "at-risk" launch (i.e., to market their products before a final decision on invalidity or infringement). The parties resolved each of these lawsuits via settlement, none of which allegedly involved a payment. *Id.*

Teva launched a Victoza AG on June 24, 2024—well before any generic manufacturer obtained final FDA approval of its ANDA. *Id.* ¶¶107–09, 117, 163–64. The only generic manufacturer alleged to have secured even *tentative* FDA approval—Hikma—did so on June 21, 2024, just three days before the launch of Teva's AG. *Id.* ¶160. On December 23, 2024, Hikma received final FDA approval and entered the market. *Id.* ¶161. Other companies secured FDA approval in 2025. *Id.* ¶¶163–64.

### D. Ozempic

In 2018, Novo Nordisk launched its "second generation" GLP-1 drug, Ozempic. *Id.* ¶¶3, 172. "Similar to Victoza, Ozempic is a self-administered GLP-1 injection indicated to: (i) improve glycemic control in adults with type 2 diabetes mellitus; (ii) reduce the risk of major adverse cardiovascular events in patients with type 2 diabetes and established cardiovascular disease; and (iii) reduce the risk of eGFR decline, end-stage kidney disease, and cardiovascular death in adults with type 2 diabetes mellitus and chronic kidney disease." *Id.* ¶4. Plaintiffs allege that Victoza did not face imminent generic competition when Ozempic launched in 2018, given their allegation

8

that the earliest date that a generic equivalent of Victoza "would have been on the market" was five years later, in February 2023. *Id.* ¶3. Nonetheless, Novo Nordisk allegedly "shifted prescriptions" from Victoza to Ozempic. *Id.* There is no allegation that Novo Nordisk withdrew Victoza at any point, but Ozempic proved to be a "blockbuster" that was far more successful than Victoza. Even before any generic version of Victoza "would have been on the market," according to Plaintiffs, the sales of Ozempic dwarfed the sales of Victoza: by 2022, Victoza's annual U.S. sales were $3.8 billion as compared to Ozempic's $19 billion. *Id.* ¶¶3, 172. Indeed, by 2024, Ozempic's annual sales topped $44 billion, compared to Victoza's $2 billion. *Id.* ¶172. Plaintiffs acknowledge, as they must, that Ozempic and Victoza are not the only treatments for type-2 diabetes. *See id.* ¶219–220 (referring to "therapeutic alternatives," "non-liraglutide diabetes control treatments," and "similarly-indicated medicines").

### E.    Plaintiffs' Claims

All Plaintiffs assert a claim for monopolization under Section 2 of the Sherman Act. *Id.* ¶¶248–60; EPP Compl. ¶¶337–47. EPPs also assert 68 state law claims (29 under state antitrust laws, seven under state consumer protection laws, and 32 under state unjust enrichment laws). EPP Compl. ¶¶173–336. Plaintiffs base their claims on their allegations that a generic version of Victoza should have entered the market by February 23, 2023 (DPP Compl. ¶203), even though the Complaints are clear that (1) no generic manufacturer had secured even tentative FDA approval prior to June 2024 (*id.* ¶¶160–64); (2) the '833 patent, which precluded generic entry until February 2026, was properly listed in the Orange Book and has never been adjudicated invalid or not infringed (*id.* ¶¶89, 158); and (3) Novo Nordisk's agreement with Teva facilitated generic entry well before expiration of the relevant Victoza patents and at a time when no generic equivalent had received FDA approval (*id.* ¶¶107–09, 117, 163–64, Table 1). Plaintiffs seek overcharge damages for purchases of Victoza and its generic equivalents *and* for Ozempic purchases. *Id.* ¶12.

9

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires a complaint to indicate that liability is more than "a sheer possibility," *id.*, and to contain enough factual matter to "raise a reasonable expectation that discovery will reveal evidence of" the claims. *Twombly*, 550 U.S. at 545. Given the "unusually high cost of discovery in antitrust cases," courts require plaintiffs to plead more than conclusory allegations in order to avoid the "potentially enormous expense" of litigating "largely groundless claim[s]." *Id.* at 558–59 (citation omitted). Further, "to avoid turning every patent case into an antitrust case, some threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase." *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003) (Posner, J.).

**ARGUMENT**

**I.    PLAINTIFFS FAIL TO PLAUSIBLY PLEAD A SHERMAN ACT SECTION 2 MONOPOLIZATION CLAIM**

Plaintiffs have not met their burden to plausibly allege a number of required elements of a Section 2 violation, including that Novo Nordisk engaged in anticompetitive conduct, had monopoly power, or inflicted antitrust injury. Each one is an independent ground for dismissal.

**A.    Plaintiffs Fail To Plausibly Plead Anticompetitive Conduct.**

Plaintiffs must allege that Novo Nordisk willfully maintained its alleged monopoly power. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97 (2d Cir. 1998). Willful maintenance requires showing anticompetitive conduct that "is distinct from business growth or development as a consequence of superior product, business acumen or historic accident." *Id.*

10

Plaintiffs' pleading burden is not lessened by labelling the conduct a "scheme." When "alleged instances of misconduct are not independently anti-competitive . . . they are not cumulatively anti-competitive either." *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 Fed. App'x 186, 191 (2d Cir. 2012) (citing *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981)). Courts in this Circuit recognize that "it is unlikely that multiple independently lawful acts can come together to create an unlawful monopoly 'broth' from which antitrust injury can arise." *La. Health Serv. & Indem. Co. v. Celgene Corp.*, 2025 WL 1056668, at *17 (S.D.N.Y. Apr. 8, 2025) (citation omitted); *see also Valassis Commc'ns, Inc. v. News Corp.*, 2019 WL 802093, at *9 (S.D.N.Y. Feb. 21, 2019) ("If the evidence underlying each form of alleged anticompetitive conduct is 'utterly lacking,' there can be no synergistic effect."). Thus, plaintiffs cannot avoid dismissal by invoking a "scheme" when the alleged conduct is not independently actionable under the antitrust laws. *See La. Health Serv.*, 2025 WL 1056668, at *35 (dismissing Section 2 claims, including reverse payment allegations, that defendant effected an overarching "scheme" to delay generic drug competition); *In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 827 (N.D. Ill. 2020) ("bring[ing] together a disparate set" of lawful actions falls short of alleging anticompetitive harm); *In re Solodyn Antitrust Litig.*, 2015 WL 5458570, at *13 (D. Mass. Sept. 16, 2015) (rejecting that "an overarching scheme can be an antitrust violation even if parts of the scheme individually are not themselves unlawful").

None of the conduct challenged in the Complaints individually or in combination plausibly alleges anticompetitive conduct in violation of Section 2 of the Sherman Act.

### 1.    Patent Litigation Settlement with Teva

Plaintiffs fail to allege that the Settlement contained a large and unjustified reverse payment, as required under the Supreme Court's seminal decision in *FTC v. Actavis*, 570 U.S. 136 (2013), to subject the settlement to antitrust scrutiny. In *Actavis*, the Supreme Court held that a

11

settlement involving an alleged reverse payment—whereby a patentee makes a payment to the alleged infringer as part of the settlement of patent litigation—must be adjudged under the "rule of reason" because such a settlement may sometimes result in anticompetitive harm when a patent holder seeks to "exclude products or processes that do not actually infringe" the patent by making a payment to the generic manufacturer to stay out of the market. *Id.* at 147–48, 151, 156. The Supreme Court explained that it is the payment "for staying out of the market" that is of concern because it may reflect an agreement by the parties "to maintain and to share patent-generated monopoly profits." *Id.* at 154, 158. The Supreme Court affirmed that parties may resolve patent litigation through agreements that "reflect[] traditional settlement considerations." *Id.* at 156. This includes a "settlement on terms permitting the patent challenger to enter the market before the patent expires." *Id.* at 154.

Plaintiffs' claim that the Settlement contained a large and unjustified payment from Novo Nordisk to Teva hinges on their assertion that the Settlement granted Teva the "exclusive" right to sell an AG version of Victoza for six months. Plaintiffs thus allege that the Settlement contained "an unlawful reverse payment that compensated Teva with generic Victoza exclusivity for the first 180-days following the launch of generic Victoza." DPP Compl. ¶228. Plaintiffs similarly allege that this "exclusive generic license" was a "no-AG provision" that allocated generic sales to Teva and "compensated Teva just like a garden-variety 'no-AG' agreement would." *Id.* ¶¶109, 114, 115.

In a so-called "no-AG agreement," an innovator settling Hatch-Waxman litigation with a first-filer generic promises not to launch its own AG, such that the first-filer would be the only generic available during the first-filer's 180-day exclusivity period. *Id.* ¶¶61, 109; *see, e.g.*, *In re Novartis & Par Antitrust Litig.*, 2019 WL 3841711, at *2 (S.D.N.Y. Aug. 15, 2019) (no-AG "includes as consideration a promise that the brand manufacturer will not market its own

12

authorized generic"); *In re Xyrem Antitrust Litig.*, 555 F. Supp. 3d 829, 858 (N.D. Cal. 2021) (complaint plausibly alleged "no-AG" agreement where brand agreed not to sell AG during first six months after first filer launched AG). As courts have explained, so-called "no-AG" agreements may be subject to antitrust scrutiny under *Actavis* in situations where "the patentee drug manufacturer agrees to relinquish its right to produce an 'authorized generic' of the drug ('no-AG agreement') to compete with a first-filing generic's drug during the generic's statutorily guaranteed 180 days of market exclusivity under the Hatch-Waxman Act as against the rest of the world." *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 393 (3d Cir. 2015).

Plaintiffs filed their complaints without access to the Settlement, and the Settlement directly contradicts Plaintiffs' claims. Novo Nordisk did ***not*** agree to refrain from launching its own AG during Teva's 180-day exclusivity period. Indeed, the Settlement granted Teva ████████ ████████████████████████████ ████████████████████████████ ████████████████████████ This case thus has no resemblance to the no-AG cases Plaintiffs invoke in their Complaints (or any other such case), in which the brand manufacturer allegedly agreed not to launch its own AG during the first-filer's 180-day exclusivity period. *See* DPP Compl. ¶63 n.9 (citing *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 397, 405 (3d Cir. 2015) (brand allegedly agreed not to sell AG until six months after first-filer entered the market)); *see also, e.g., In re Novartis & Par*, 2019 WL 3841711, at *2 (first-filer generic licensed to enter in September 2014 and brand allegedly agreed it would not launch its own AG until March 2015); *Xyrem*, 555 F. Supp. 3d at

13

852 (brand allegedly agreed not to sell AG for "at least the first six months that [first filer] is eventually on the market").[7]

As a result, rather than being somehow plausibly anticompetitive, the Settlement achieved the procompetitive result of allowing a generic version of Victoza to enter the market at a time that no generic manufacturer—including Teva—had FDA approval for their product.  The Settlement states that ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ ███████████████ The Settlement thus provided a pathway for generic entry earlier than the date of expiration of the challenged patents, a demonstrably procompetitive result.  "[T]he *Actavis* Court expressly provided that a 'settlement on terms permitting the patent challenger to enter the market before the patent expires would bring about competition to the consumer's benefit.'"  *In re Actos*, 2015 WL 5610752, at *14 (S.D.N.Y Sept. 22, 2015) (quoting *Actavis*, 570 U.S. at 154).  *See also Watson Lab'ys, Inc. v. Forest Lab'ys. Inc.*, 101 F.4th 223, 240 (2d Cir. 2024) (affirming dismissal of reverse payment claims where neither the settlement terms nor the allegations were a plausible basis to infer that the brand paid any generic "purely so [it] w[ould] give up the patent fight"—the only anticompetitive harm condemned by *Actavis*) (quoting *Actavis*, 570 U.S. at 152)).

Plaintiffs' allegations are also not plausible because, one month *before* Novo Nordisk and Teva entered into the Settlement, the FTC and Teva entered into a ten-year consent decree, pursuant to which Teva committed not to enter into any "Brand/Generic Settlement," as defined in that

---

[7] For these same reasons, Plaintiffs' attempts to assign a value of the AG license to Teva—premised on the assumption that Novo Nordisk provided Teva "an exclusive generic license"—are not plausibly pleaded and provide no support for their allegations that the Settlement is anticompetitive under *Actavis*. *See, e.g.*, DPP Compl. ¶¶113–15.

order.  *See* Stipulated Revised Order for Permanent Injunction, *FTC v. Cephalon, Inc.*, 2:08-cv-02141-MSG, ECF No. 410 (E.D. Pa. Feb. 21, 2019).[8]  The consent order became public a month before Novo Nordisk and Teva settled the Victoza patent litigation and remains in effect to this day.  The consent order expressly prohibits Teva from entering into any settlement containing an agreement in which the brand manufacturer commits not to launch an AG, among other prohibited agreements.  The consent order subjects Teva to compliance monitoring to ensure adherence to those obligations.  Consistent with the statute requiring submission of all settlements of Hatch-Waxman patent litigation and Teva's consent decree, Novo Nordisk and Teva agreed to submit the Settlement to the FTC.  Ex. 1, § 14.01.  Plaintiffs' theory thus depends on the inference that Teva nevertheless entered into an agreement expressly prohibited by the consent order just weeks after it came into force, knowing that the Settlement would be submitted to the FTC and the Monitor—and the FTC took no action in response to what Plaintiffs characterize as an obvious unlawful reverse payment.  That is simply not plausible.

### 2.    Orange Book Listings

With no viable claim that Novo Nordisk's settlement with Teva violates the antitrust laws, none of Plaintiffs' hodge-podge of remaining allegations state a violation of the antitrust laws.  To begin with, Plaintiffs assert that Novo Nordisk wrongfully listed "numerous patents" in the Orange Book.  DPP Compl. ¶5.  Plaintiffs' allegation is implausible because Novo Nordisk listed two patents—the '343 patent and the '833 patent—that Plaintiffs do not claim were improperly listed and thus serve as the proper basis for the regulatory 30-month stay.  In other words, because Plaintiffs fail to plead that all of Novo Nordisk's patent listings were improper, Plaintiffs fail to

---

[8] The Court may take judicial notice of the public consent decree.  *See, e.g.*, *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 124 n.12 (2d Cir. 2010) ("[W]e are empowered to take judicial notice of the 2003 Consent Order, as it is a public record.").

state a plausible antitrust claim premised on an alleged improper Orange Book listing.  Plaintiffs also fail to plead that any improper Orange Book listing resulted in the delay of approval of a generic version of Victoza.

A viable Orange Book listing claim requires that a plaintiff plausibly plead that an innovator's improper listing of a patent in the Orange Book resulted in a delay in generic competition for the innovator's product, thereby extending the asserted monopoly on the innovator's product.  *See In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97–99 (2d Cir. 2017) (affirming dismissal of alleged improper Orange Book listing claim for failure to plausibly plead the listing caused the alleged delay in generic entry).  In essence, the harm challenged in an improper Orange Book listing claim is that the listing can delay the timing of generic entry because a generic manufacturer must make a certification as to the patent under the Hatch-Waxman Act.  *See id.* at 94, 97.  For example, a generic manufacturer might choose to address an improperly listed patent by submitting a Paragraph IV certification, which can result in a 30-month stay in FDA approval of the generic manufacturer's product.  Alternatively, the generic manufacturer might decide to refrain from marketing the product until patent expiry.  21 U.S.C. § 355(j)(5)(B)(iii).  Thus, it is this interplay in the regulatory regime—that an improper listing can impact the timing of generic entry, including potentially triggering an unwarranted stay in the approval of the generic product—that can create an actionable antitrust claim based on an improper Orange Book listing.

The allegations in this case do not state an actionable antitrust claim for two fundamental reasons.  *First*, Plaintiffs do not allege that two of the patents in the Orange Book—the '343 patent covering the liraglutide compound and the '833 patent covering a method of using of propylene glycol to prevent clogs from forming in the injection pen—were improperly listed.  Without an

16

allegation that these patents were improperly listed, Plaintiffs have no basis to claim that the 30-month stay triggered by the listing of those patents caused any unlawful delay in the approval of a generic version of Victoza. Indeed, the '343 patent did not expire until February 2023 and the '833 patent did not expire until February 13, 2026—more than a year and a half after generic entry occurred in June 2024 pursuant to the licensed entry date in the Teva Settlement.

The Second Circuit's decision in *Actos* is instructive. 848 F.3d at 98. There, plaintiffs alleged that Takeda incorrectly characterized its method-of-use patents as also being drug product patents in the Orange Book and that "Takeda's allegedly false descriptions of its . . . patents forced the generics to file Paragraph IV certifications" that delayed generic entry. *Id.* at 98. This theory, though, presupposed that the generic manufacturers knew that Takeda had described the patents as drug product patents in the Orange Book. *Id.* But, this alleged mischaracterization did not appear in the Orange Book because, at the time, Orange Book listings reflected only one description per patent, and if a patent claimed both a method of using a drug and the drug product itself, it would only be listed as a method-of-use patent. *Id.* at 98–99. Because the generics could not have known of the alleged mischaracterization, this meant the "generic applicants would necessarily have filed their Paragraph IV certifications for some other reason." *Id.* In sum, the *Actos* plaintiffs failed to plead an actionable Orange Book listing claim because they did not plead that the generics would not have still filed Paragraph IV certifications but for the unlawful Orange Book listing.

This case presents the same issue. Even if the allegedly wrongfully-listed patents had not been listed in the Orange Book, under Plaintiffs' own allegations, the '343 patent and the '833 patent would have remained in the Orange Book, and the generic applicants would have made Paragraph IV certifications as to those patents, providing a basis for a 30-month stay. Plaintiffs have thus failed to allege an actionable, plausible Orange Book listing claim because Plaintiffs fail

17

to make any allegation that the '343 patent or the '833 patent was improperly listed. Indeed, Novo Nordisk's complaint against Teva in the patent case explicitly stated that Teva provided a Paragraph IV certification against these patents. *See* DPP Compl. ¶¶93–95; *Novo Nordisk Inc. v. Teva Pharms. USA, Inc*., No. 17-cv-00227-JFB-SRF, ECF No. 1 ¶14 ("By letter to NNI, dated January 20, 2017, Teva stated that Teva's ANDA contained certifications pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '343, '833, '618, '893, and RE '956 patents are invalid, unenforceable, or will not be infringed by the commercial manufacture, use, or sale of Teva's Product (the 'Paragraph IV Certifications').").

*Second*, what makes an Orange Book listing claim actionable under the antitrust laws is the consequence that it can delay FDA approval, and consequently, entry of a generic product. Here, Plaintiffs assert that the alleged improper listing of certain patents is actionable under the antitrust laws because it "trigger[ed] the automatic 30-month stay of FDA approval of generic Victoza." DPP Compl. ¶252. But, Plaintiffs make no allegation that any generic manufacturer would have received FDA approval but-for any 30-month stay. For example, the 30-month stay as to Teva expired in July 2019, and Plaintiffs do not plead that the 30-month stay somehow impacted approval of Teva's ANDA product, which has yet to receive FDA approval. Indeed, no generic Victoza product received even *tentative* FDA approval until Hikma did so almost five years later, on June 21, 2024. For this additional reason, Plaintiffs fail to state a plausible antitrust claim premised on its Orange Book listing allegations.

### 3. "Bottle-Necking"

Plaintiffs next allege that the settlement between Novo Nordisk and Teva ensured that Teva's first-filer 180-day exclusivity created a "bottleneck" and prevented the FDA from approving any other Victoza generics prior to the expiration of this 180-day period. *E.g.*, *id*. ¶¶5(d),

18

134, 211. There are two fatal flaws with this allegation—both of which independently prevent Plaintiffs from stating an actionable antitrust claim premised on "bottlenecking."

*First*, Plaintiffs completely ignore the fact that the Hatch-Waxman Act was amended to prevent the exact bottlenecking allegations Plaintiffs assert. Prior to the 2003 Medicare Prescription Drug, Improvement, and Modernization Act ("MMA") amendments to the Hatch-Waxman Act, a "bottleneck" could occur if the first filer's 180-day exclusivity period was never triggered, thereby preventing final approval of any of the subsequent-filer's ANDA applications. This was because the first filer's 180-day exclusivity period would not commence until either (i) the first filer began to commercially market the drug or (ii) a final and non-appealable court decision in connection with Paragraph IV litigation held that the patent-holder's patents were invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv) (2000), *amended by*, Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, sec. 1102, § 355(j)(5), 117 Stat. 2066, 2457–2460 (2003); 21 C.F.R. § 314.107(e) (1999) (providing that only a final and non-appealable judgment commences the exclusivity period); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 33 (D.D.C. 2000) (describing the trigger of the first filer's exclusivity period). If neither event occurred, the first filer would remain entitled to its 180-day exclusivity, but the 180-day clock would never start, and the FDA lacked authority to grant final approval for any subsequent ANDA applications until the end of the first-filer's 180-day exclusivity period. 21 U.S.C. § 355(j)(5)(B)(iv) (2000). The pre-MMA framework thus created a potential "bottleneck" where subsequent-filers' ANDA applications could not receive final approval if the first-filer never commercially marketed the drug and there was no judgment on the patent-holder's patents.

The 2003 MMA amendments prevented such "bottlenecks" from occurring by adding provisions whereby the first-filer may forfeit its 180-day exclusivity period. As "[o]ne of the

19

amendment's primary sponsors noted during the final floor debate," the forfeiture provisions in the MMA amendments were designed to "ensure that the 180-day exclusivity period . . . cannot be used as a bottleneck to prevent additional generic competition." *Ranbaxy Lab'ys, Ltd. v. Burwell*, 82 F. Supp. 3d 159, 166 (D.D.C. 2015) (quoting 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer)); *see also F.T.C. v. Watson Pharms., Inc.*, 677 F.3d 1298, 1311 n.9 (11th Cir. 2012) (discussing the effects of the MMA amendments on bottlenecking). These forfeiture events eliminate the "bottleneck" by causing the first-filer to lose its 180-day exclusivity period under certain circumstances and allowing the FDA to grant final approval to subsequent applications. *See* 21 U.S.C. § 355(j)(5)(D)(i).

Under the "failure to market" provision now in the Act, a first-filer can forfeit exclusivity as to any later filers when, among other circumstances, (i) a later filer receives a final judgment that its proposed ANDA product either does not infringe the patents certified against by the first-filer or that such patents are invalid; and (ii) the first-filer fails to market before 75 days have passed since such judgment from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken. *See* 21 U.S.C. § 355(j)(5)(D)(i)(I)(bb)(AA). Under the statute, the later filer must have tentative FDA approval to trigger such forfeiture. *See Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1369 (Fed. Cir. 2015) ("There are two requirements for forfeiture: a court must have entered a final decision of non-infringement that is no longer appealable (certiorari aside), and the second (or later) filer must have received tentative approval. The first-filer forfeits its exclusivity if it has not entered 75 days after those two requirements are satisfied.").

Since the MMA was enacted, courts no longer recognize antitrust violations based on bottlenecking allegations, because the amendments specifically dealt with any potential

20

bottlenecking concerns. "[T]he forfeiture triggers' purpose was to 'ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'" *Ranbaxy Lab'ys, Ltd. v. Burwell*, 82 F. Supp. 3d 159, 166 (D.D.C. 2015) (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003)); *see also F.T.C. v. Watson Pharms., Inc.*, 677 F.3d 1298, 1311 n.9 (11th Cir. 2012) ("In 2003 Congress amended the statutory provisions . . . to keep corks out of bottles."); *Meijer, Inc. v. Ranbaxy Inc.*, 2016 WL 4697331, at *3 (D. Mass. June 16, 2016) (R&R) (similar). The settlements at issue here occurred years after the amendments were law.

*Second*, notwithstanding the MMA, Plaintiffs' bottlenecking theory turns on the notion that Novo Nordisk somehow improperly "induced" the later-filing generics to settle and drop their patent challenges, such that the later filing generics gave up the opportunity to potentially trigger forfeiture of Teva's 180-day exclusivity under the Act. *E.g.*, DPP Compl. ¶5(d), 132, 252. The problem with that theory is that there is no allegations that the settlements with the later-filing generics were unlawful under the controlling authority in *Actavis*. Thus, any "maintenance" of Teva's 180-day exclusivity period is a result of the regulatory scheme established by the Hatch-Waxman Act and does not state a plausible antitrust claim.

*In re Tamoxifen Citrate Antitrust Litigation* is instructive. 466 F.3d 187 (2d Cir. 2006). In *Tamoxifen*, the FDA determined that Barr was entitled to the 180-day exclusivity period in response to a citizen petition that Barr filed. *Id.* at 220. Plaintiffs claimed that Barr improperly obtained its 180-day exclusivity (and its ability to block later-filing ANDAs) because its citizen petition was anticompetitive. *Id.* at 216–17. The court determined that plaintiffs failed to state a plausible antitrust claim for manipulation of the 180-day exclusivity period because prior to FDA's determination, the subsequent generic filers had lost infringement suits brought by the innovator

Zeneca. *Id.* at 194–95.  As a result, the court concluded that the lack of competition in the market was not caused by Barr's assertion of exclusivity but instead by the subsequent filers' inability to invalidate Zeneca's patents.  *Id.* at 220.  Applying *Tamoxifen*'s reasoning to the instant matter, Plaintiffs' purported "delay" in the entry of generic Victoza was not due to any anticompetitive conduct on the part of Novo Nordisk or manipulation of the 180-day exclusivity period, but rather the inability of the subsequent-filers to prevail in their infringement suits.  Therefore, as in *Tamoxifen*, Plaintiffs do nothing more than take issue with the regulatory regime limiting entry to the market, which does not state an antitrust claim.

In sum, Plaintiffs' allegations that Novo Nordisk's conduct resulted in a "bottleneck" preventing subsequent filers from obtaining generic approval does not state a plausible, actionable antitrust claim in light of the current statutory regime.

### 4.    Settlements with Other Generics

Although Plaintiffs include allegations that Novo Nordisk entered into settlement agreements with the later filing generics, they do not allege that the settlements were unlawful.  As described above, under *Actavis*, settlement of patent infringement litigation with a "large and unjustified" payment to the alleged infringer may be subject to antitrust scrutiny.  *Watson Lab'ys*, 101 F.4th at 238 ("A reverse payment can violate the antitrust laws only if it is both (1) 'large' and (2) 'unjustified,' or unexplainable.  Both of these prongs must be plausibly alleged at the pleading stage pursuant to the general pleading principles set forth in *Twombly* and *Iqbal*.") (quoting *Actavis*, 570 U.S. at 158).  Plaintiffs cannot assert an antitrust claim based on the settlements with any later filing generics because there is no allegation of a payment by Novo Nordisk—much less a "large and unjustified" payment.

To the contrary, the Complaints allege nothing more than traditional settlement agreements.  *See Actavis*, 570 U.S. at 156 ("Where a reverse payment reflects traditional settlement

22

considerations . . . there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement."); *Watson Lab'ys*, 101 F.4th at 238 (affirming dismissal because there was no allegation reflecting anything other than "one of the 'traditional settlement considerations' squarely privileged under *Actavis*") (quoting *Actavis*, 570 U.S. at 156); *Mayor and City of Balt. v. AbbVie*, 42 F.4th 709, 715–16 (7th Cir. 2022) (affirming dismissal that allowed biosimilar entry before patent expiration because "AbbVie struck a normal settlement without any payment to the entrants, a settlement of the kind that *Actavis* says is not problematic").

For this reason, Plaintiffs fail to state an actionable antitrust claim under *Actavis* based on the settlements with the later-filing generics.

### 5.    "Switching" Victoza to Ozempic

The Complaints are entirely unclear whether Plaintiffs' antitrust claims are based on the alleged "switch" of "prescriptions from [Novo Nordisk's] first generation GLP-1 product, Victoza (liraglutide), to its second generation GLP-1 product, Ozempic (semaglutide)."  DPP Compl. ¶9. Nonetheless, application of the law on so-called "product-hopping" forecloses any such claim. Because "[p]roduct innovation generally benefits consumers," a claim under the Sherman Act premised on the introduction of successive products is viable only "when a monopolist combines product ***withdrawal*** with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 652–54 (2d Cir. 2015) ("*Namenda*") (emphasis added) (citations omitted).  This is called a "hard switch" because it removes the legacy product from the market, impeding generic entry by coercing a switch to the new product.  *Id.* at 654, 655 ("By removing [the legacy product] from the market prior to generic . . . entry, Defendants sought to deprive consumers of that choice").  In contrast, a "soft switch," whereby the legacy product

remains on the market such that patients and doctors may "evaluate the products and their generics on the merits in furtherance of competitive objections," is not anticompetitive. *Id.*

The allegations here do not state an actionable product-hopping claim under this controlling precedent. Plaintiffs do not allege that Victoza has ever been withdrawn from the market; thus, there has been no "hard switch" and no deprivation of consumer choice. *See In re Asacol Antitrust Litig.*, 233 F. Supp. 3d 247, 269 (D. Mass. 2017) (dismissing product-hopping claim where "both products remained on the market contemporaneously for four years"); *Walgreen Co. v. AstraZeneca*, 534 F. Supp. 2d 146, 152 (D.D.C. 2008) ("The fact that a new product siphoned off some of the sales from the old product and, in turn, depressed sales of the generic substitutes for the old product, does not create an antitrust cause of action."). Indeed, Plaintiffs have simply pleaded the procompetitive conduct of Novo Nordisk's continued innovation and introduction of a second-generation GLP-1.

### B.    Plaintiffs Fail To Plausibly Plead Monopoly Power.

The total absence of well-pled, plausible allegations of monopoly power place Plaintiffs squarely within the rare group of cases where dismissal based on failure to plead monopoly power is warranted. Plaintiffs' Section 2 claim requires well-pled allegations that Novo Nordisk has monopoly power in a properly defined relevant market. *Verizon Commc'ns v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 407 (2004); *Tops Markets*, 142 F.3d at 97. "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). It may be proven directly by evidence of the control of prices or the exclusion of competition inferred from one firm's large percentage share of a properly defined relevant market, combined with entry or expansion barriers. *Tops Markets*, 142 F.3d at 98 (citation omitted).

24

Plaintiffs allege that the relevant market is limited to the liraglutide molecule, i.e., Novo Nordisk's brand name product Victoza and Victoza's AB-rated generic equivalents.  DPP Compl. ¶216.  But courts are "reluctant to find single-product markets."  *Mylan Pharms., Inc. v. Warner Chilcott Pub. Co.*, 2015 WL 1736957, at *8 (E.D. Pa. Apr. 16, 2015), *aff'd*, 838 F.3d 421 (3d Cir. 2016).  Even if the law did not disfavor the single-molecule market Plaintiffs propose, Plaintiffs do not plead the allegations necessary to render plausible a market limited to liraglutide products. Much to the contrary, Plaintiffs allegations directly undercut their alleged market.

*First*, Plaintiffs' allegations are entirely perfunctory.  The Complaints' sections on "market power and definition" could be describing just about any pharmaceutical product, as they plead nothing specific to Victoza or to treatments for type-2 diabetes generally.  DPP Compl. ¶¶214–26. Plaintiffs must include "all products reasonably interchangeable by consumers for the same purposes."  *United States v. Am. Express Co.*, 838 F.3d 179, 196 (2d Cir. 2016) (citation and quotation marks omitted).  Plaintiffs fail to allege why other treatments for type-2 diabetes—such as insulin products and other GLP-1 products, like exenatide (brand name Byetta), dulaglutide (Trulicity), semaglutide (Ozempic), or tirzepatide (Mounjaro)—are not interchangeable with Victoza.  *See* DPP Compl. ¶¶219–220.  The Complaints actually concede the opposite—that another GLP-1, Ozempic, *is interchangeable with Victoza*—and then never explain why all GLP-1s for type-2 diabetes are not also interchangeable with Victoza.  Indeed, if Ozempic were not interchangeable with Victoza, then Plaintiffs' allegation that large numbers of Victoza patients "switched" to Ozempic is not plausible.  Plaintiffs cannot have it both ways.

*Second*, Plaintiffs do not assert a single well-pled allegation to support the conclusory allegation that "Victoza does not exhibit significant, positive cross-elasticity of demand with respect to price with any other similarly indicated prescription drug."  *Id.* ¶219.  For example,

25

Plaintiffs do not allege the price for Victoza, its generic equivalents, Ozempic, or any other treatment for type-2 diabetes—much less allegations that detail the impact on Victoza's sales from a price change of the other products or the impact on those other products' sales from a price change in Victoza.  The only inference available to the Court based on the allegations is that products other than generic equivalents of Victoza—including products that are not liraglutide-based—do in fact impact the sales of Victoza.  The introduction of one such treatment (Ozempic) allegedly resulted in the loss of substantial sales of Victoza, from $5.37 billion in 2018 (when Ozempic launched) to $3.8 billion before generic equivalents of Victoza "would have launched" in early 2023 and then finally to $2 billion by 2024—at a time when Ozempic had $44 billion in U.S. sales.  *Id.* ¶¶112, 172, 192.

Motions to dismiss are granted when "'the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, ***or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products***.'"  *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)) (emphasis added).  By Plaintiffs' own allegations, a liraglutide-only market does not encompass all interchangeable substitutes, because it does not encompass Ozempic, despite allegations that patients switched from Victoza to Ozempic.  The alleged "switching" between Victoza and Ozempic suggests that they are economic substitutes, and "[w]here the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products . . . the relevant market is legally insufficient and a motion to dismiss may be granted."  *Queen City Pizza.*, 124 F.3d at 436 ; *see also Bayer Schering Pharma AG v. Sandoz*, 813 F. Supp.

26

2d 569, 576–78 (S.D.N.Y. 2011) (rejecting market definition because of failure to plead other treatment options).[9]

When other GLP-1s, and potentially other diabetes treatments, are added to the relevant market, Plaintiffs' allegations concerning Novo Nordisk's monopoly power—a necessary element of a Section 2 claim—fall apart.  Novo Nordisk is not asking the Court to find that the relevant market includes any particular products, nor does the Court need to do so to grant the motion on this basis.  It should be abundantly clear, however, that Plaintiffs have not met their burden to allege sufficient facts to plausibly plead a market limited to liraglutide.

### C.      Plaintiffs Fail To Plausibly Plead Antitrust Injury.

Plaintiffs' claims fail for the independent reason that their theory of causation is too speculative to plead antitrust injury—a required element of all federal antitrust claims—because no generic competitor had FDA regulatory approval at the time that Plaintiffs claim generic entry should have occurred.  Plaintiffs' purported antitrust injury must be causally related to Novo Nordisk's challenged conduct that allegedly delayed generic entry of Victoza.  Plaintiffs "must show that a defendant's anticompetitive act was a 'material' and 'but-for' cause of plaintiff's injury." *Actos*, 848 F.3d at 97–98.  Plaintiffs allege that generic Victoza should have entered the market by February 23, 2023.  *E.g.*, DPP Compl. ¶¶84, 186.  But their Complaints directly

---

[9] For example, the U.S. government has found that GLP-1s indicated for type-2 diabetes are economic substitutes in terms of pricing of semaglutide-containing products.  In its analysis of potential pricing for semaglutide-containing products under the Inflation Reduction Act, the Centers for Medicare Services ("CMS") based its decision on pricing of those products, in part, on CMS's conclusion that semaglutide and liraglutide are just two of a number of therapeutic alternatives for type-2 diabetes, including dapagliflozin, dulaglutide, empagliflozin, glimepiride, glipizide, linagliptin, metformin, pioglitazone, sitagliptin phosphate, and tirzepatide.  Maximum Fair Price (MFP) Explanation for Ozempic; Rybelsus; Wegovy at 9 (available at https://www.cms.gov/priorities/medicare-prescription-drug-affordability/overview/medicare-drug-price-negotiation-program/selected-drugs-negotiated-prices).  The government came to that conclusion "due to clinical guideline recommendations, utilization in the Medicare population, and other considerations." *Id.*

contradict this assertion because no generic product had FDA approval to launch by February 2023. The first alleged approval was Hikma's ***tentative*** approval over one year later on June 21, 2024. *Id.* ¶160. And notably, Plaintiffs do not allege that Novo Nordisk took any action to delay FDA approval for the ANDA filers.

Courts addressing similar claims recognize that, when a product lacks final FDA approval and is therefore unable to launch, a plaintiff cannot establish a cognizable injury based on a theory of delayed generic entry. *Solodyn* and *Asacol* reflect the point. The court in those cases addressed claims that settlements of patent infringement litigation delayed generic entry through licensed generic entry dates. In both instances, the courts dismissed the complaints because, among other reasons, plaintiffs failed to plausibly plead that generic competitors could have secured FDA approval to launch prior to the agreed-upon entry dates in the settlements. *See Solodyn*, 2015 WL 5458570, at *9 (licensed entry date of November 26, 2011; FDA approval not secured until November 30, 2011); *Asacol*, 233 F. Supp. 3d at 265 (licensed entry date of November 15, 2015; at the time decision was rendered in 2017, FDA still had not approved ANDA for generic). Put simply, the failure to secure FDA approval severed any causal link between defendants' alleged conduct and the injuries plaintiffs asserted on the basis of delayed entry, necessitating dismissal of the claims.

Here, too, Plaintiffs' own allegations state that no generic received final FDA approval by February 23, 2023, when generic entry allegedly should have occurred. As Plaintiffs' own Complaints reflect, generic entry could not have occurred anytime in 2023 because no ANDA filer had FDA approval to launch. *See Id.* (dismissing claim because "'had [the generic] not settled, litigated until the end and won, [the generic] still would have needed FDA approval to launch its drug'") (citation omitted).

28

This serves as an independent basis to dismiss the Complaints.

## II.   EPPs' STATE LAW CLAIMS MUST BE DISMISSED

### A.   The State Law Claims Fail for the Same Reasons as the Federal Claims.

EPPs' state law antitrust, consumer protection, and unjust enrichment claims are premised on the exact same conduct as the federal antitrust claims. Courts regularly dismiss state law claims when the federal antitrust claim fails. *See, e.g.*, *Watson Lab'ys Inc. v. Forest Lab'ys. Inc.*, 101 F.4th 223, 250 n.17 (2d Cir. 2024) ("Because there is no dispute that all of Plaintiffs' federal and state claims are based on the same underlying conduct, they all fall together."); *Louisiana Health*, 2025 WL 1056668, at *33 (dismissing all state law claims where federal antitrust claims failed); *In re Tamoxifen Citrate Antitrust Litig.*, 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) ("[S]ince Plaintiffs fail to state a claim under the Sherman Act, and since the state antitrust law claims are based on the same allegations, those claims are also dismissed."), *aff'd*, 466 F.3d 187 (2d Cir. 2006).

Because the federal antitrust claims fail, the Court should dismiss the EPP complaints on this ground alone and need not delve into the deficiencies of the specific state laws EPPs assert.

### B.   EPPs' Cursory and Threadbare Allegations Are Insufficient to Support the State Law Claims.

In addition, the EPPs provide no particularized allegations about how the conduct at issue violates the differing requirements of the 29 antitrust, seven consumer protection, and 32 unjust enrichment state laws under which EPPs bring claims. "Threadbare recitals" of the elements of a given cause of action are insufficient. *Iqbal*, 556 U.S. at 678. A plaintiff must plead facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Thus, in this Circuit, "[m]ere 'labels and conclusions' are insufficient; and absent 'further factual enhancement,' 'naked assertion[s]' will not salvage a complaint otherwise subject to dismissal."

*Watson Lab'ys*, 101 F.4th at 235 (internal citations omitted) (quoting *Twombly*, 550 U.S. at 555 and *Iqbal*, 556 U.S. at 678).

The claims fall well short of this standard because EPPs offer generalized allegations without sufficient pleadings as to how the conduct at issue violates the elements of those statutes and causes of action. Courts regularly dismiss state law claims based on such inadequate pleading. *See, e.g.*, *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 163 (2d Cir. 2016) (affirming dismissal of all state consumer protection and unfair trade law claims where plaintiffs "fail[ed] to explain adequately how the defendants' conduct violated any of the state consumer protection and unfair trade statutes"); *In re Bystolic Antitrust Litig.*, 583 F. Supp. 3d 455, 498 (S.D.N.Y. 2022) (dismissing state law claims because plaintiff "cannot simply enumerate a long list of state-law claims . . . and rely on the defendants and the court to sort out whether or how those laws can act as surrogates for antitrust law") (quoting *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 255−56 (D. Conn. 2015)); *Actos*, 2015 WL 5610752, at *28 ("Plaintiffs merely restate their antitrust allegations as separate consumer protection claims, providing no distinct factual basis for a violation of consumer protection law. This is insufficient to meet the Rule 8 pleading standard under *Twombly* and *Iqbal*."); *United Healthcare Servs., Inc. v. United Therapeutics Corp.*, 2024 WL 1256266, at *19 (D. Md. Mar. 25, 2024) (dismissing state consumer protection claims where "the plaintiff has not pled any of the elements of these statutes or even explained in briefing how the defendant violated them"). EPPs' claims should be dismissed on this ground.[10]

---

[10] EPPs assert claims under a myriad of states, but only allegedly reimbursed for Victoza in 10 states: Alabama, Connecticut, Delaware, Florida, North Carolina, New Jersey, New York, Pennsylvania, South Carolina, and Virginia. EPP Compl. ¶14. Although the Court must address this issue as part of the predominance inquiry under Rule 23(b)(3), *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018), the Court may dismiss for failure to (continued…)

### C.    Many State Law Claims Must be Dismissed for Other Reasons.

As shown in detail below and summarized in Appendix 1, many state law claims are deficient.[11]

#### 1.    State Antitrust Claims

##### a)    *States that do not permit antitrust claims by indirect purchasers.*

EPPs bring state antitrust claims explicitly as an indirect purchaser, alleging that the proposed class members "purchased substantial amounts of Victoza indirectly from Defendants" and paid artificially inflated prices as a result of Defendants' alleged conduct. EPP Compl. ¶¶ 180–82. EPPs further allege that these overcharges were "passed through the chain of distribution" to EPPs and the putative class. *Id*. ¶152. But **Illinois** and **Utah** bar or limit class action claims by indirect purchasers. 740 Ill. Comp. Stat. 10/7(2) ("no person shall be authorized to maintain a class action … for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General"); Utah Code Ann. § 76-16-511(1)(a)(i) (permitting indirect-purchaser antitrust claims only where the plaintiff is a citizen or resident of Utah).[12]

##### b)    *States that bar claims based on unilateral conduct.*

---

state a claim under state law. *Kelly v. Beliv LLC*, 640 F. Supp. 3d 286, 300 (S.D.N.Y. 2022). In other words, "plaintiffs cannot use class actions to escape pleading requirements." *Gibson v. Bartlett Dairy, Inc.*, 2022 WL 784746, at *10 (E.D.N.Y. Mar. 15, 2022) (internal quotation omitted).

[11] EPPs bring their claims on behalf of a nationwide class, but do not assert any claims in the following jurisdictions: Arkansas, Colorado, Delaware, Georgia, Idaho, Indiana, Kentucky, Louisiana, Ohio, Oklahoma, Texas, Virginia, Washington, and Wyoming. Novo Nordisk has not advanced arguments applicable to these states because EPPs cannot recover in states where they have not brought claims.

[12] *See also In re Humira (Adalimumab) Antitrust Litig.*, 465 F. Supp. 3d 811, 850 (N.D. Ill. 2020) (noting that Illinois law "prohibits class action antitrust claims brought by indirect purchasers"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2015 WL 5458570, at *17–18 (D. Mass. Sept. 16, 2015) (same); *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *20 (D. Del. July 5, 2022) (dismissing Utah indirect purchaser antitrust claim where no named plaintiff was a Utah resident or citizen); *In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 374 (D.R.I. 2019) (same).

The state antitrust claims are premised on allegations of monopolization. *See, e.g.*, EPP Compl. ¶¶1–7, 59–64, 77–84, 98–100, 109–10, 173–79. While EPPs also allege agreements with generic manufacturers, the EPPs' antitrust theories broadly challenge Novo Nordisk's conduct as a single firm to allegedly "maintain and extend its monopoly" and "exclude competitors." *Id*. ¶¶174–179. Several state antitrust statutes invoked by EPPs, however, do not permit claims based on such unilateral conduct.

- **California**: *See* Cal. Bus. & Prof. Code § 16720 (Cartwright Act applies to a "combination of capital, skill or acts by two or more persons"); *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 138 Cal. Rptr. 3d 620, 626 (Cal. Ct. App. 2012) (the "Cartwright Act bans combinations, but single firm monopolization is not cognizable under the Cartwright Act.").

- **Kansas**: *See* Kan. Stat. Ann. § 50-101 ("a trust is a combination of capital, skill, or acts, by two or more persons"); *Staley v. Gilead Sciences*, Inc., 446 F. Supp. 3d 578, 642 (N.D. Cal. 2020) (dismissing plaintiffs' Kansas antitrust claim to the extent that claim was based on unilateral action).

- **New York**: *See* N.Y. Gen. Bus. Law § 340(1) (declaring certain "contract[s], agreement[s], arrangement[s], or combination[s]" to be illegal); *Glob. Reinsurance Corp. U.S. Branch v. Equitas Ltd.*, 969 N.E.2d 187, 192 (N.Y. 2012) (holding a New York antitrust claim "must allege both concerted action by two or more entities and a consequent restraint of trade"); *Commonwealth Elec. Inspection Servs. v. Town of Clarence*, 776 N.Y.S.2d 687, 688–89 (N.Y. App. Div. 2004) (New York state antitrust law does not apply to unilateral action) (relying on *State of N.Y. v. Mobil Oil Corp.*, 344 N.E.2d 357, 359–60 (N.Y. 1976)); *Staley*, 446 F. Supp. 3d at 642 (dismissing plaintiffs' New York antitrust claim to the extent that claim was based on unilateral action).

- **Tennessee**: *See* Tenn. Code Ann. § 47-25-101 (outlawing "arrangements, contracts, agreements, trusts, or combinations" in restraint of trade); *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1109 (N.D. Cal. 2007) (dismissing claim under Tennessee Trade Practices Act where indirect purchasers only allege unilateral conduct; *Staley*, 446 F. Supp. 3d at 642 (similar).

    c)      *States that bar claims without sufficient intrastate conduct.*

EPPs allege that Defendants' conduct "substantially affect[ed] interstate commerce" because branded Victoza "was shipped into each state" and "sold to or paid for by Plaintiff and members of the Class and distributors and retailers in each state were allegedly foreclosed from

32

offering lower-priced products. *Id.* ¶¶158–159, 161.  EPPs also allege that Defendants possessed monopoly power "nationwide and in each state and territory."  *Id.* ¶¶174, 338.  These generalized allegations are insufficient to satisfy state antitrust statutes that require showing that the challenged conduct occurred within the state or had a substantial intrastate nexus.

- **Mississippi**: *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 778–79 (D. Minn. 2020) (dismissing Mississippi antitrust claim based on conclusory allegations of indirect sales within the state); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 266–67 (S.D.N.Y. 2019) (noting that Mississippi antitrust law focuses on where the anticompetitive conduct occurred rather than the effects of that conduct).

- **Nevada**: *See In re Cast Iron Soil Pipe & Fittings Antitrust Litig.*, 2015 WL 5166014, at *26 (E.D. Tenn. June 24, 2015) (dismissing Nevada antitrust claim where plaintiffs' allegations were conclusory and failed to address any connection between Nevada and the challenged conduct).

- **South Dakota**: *See* S.D. Codified Laws § 37-1-3.1 (prohibiting restraints of trade "any part of which is within this state"); *In re Auto. Parts Antitrust Litig.*, 2018 WL 1135504, at *3–4 (E.D. Mich. Jan. 16, 2018) (dismissing South Dakota antitrust claim for failure to plead intrastate effects despite complaint's assertion that class members had paid supra-competitive prices within the state); *Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 243–44 (W.D.N.Y. 2021) (dismissing South Dakota antitrust claim for failure to allege intrastate effects).

- **Tennessee**: *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 523–24 (Tenn. 2005) (requiring that alleged anticompetitive conduct affect Tennessee commerce to a substantial degree and dismissing "even though the conduct resulted in [plaintiff] paying higher prices"); *Cast Iron Soil Pipe And Fittings*, 2015 WL 5166014, at *26 (same).

### 2.    State Consumer Protection Claims

a)    *States that bar consumer protection claims as a result of* Illinois Brick*.*

**Alaska** and **South Carolina** bar indirect purchasers, such as EPPs here, from bringing antitrust claims under those states' consumer protection statutes where *Illinois Brick* bars these same claims under those states' antitrust statutes.  *See Miami Prods. & Chem. Co.,* 546 F. Supp. 3d at 236–37 (dismissing claim, noting "no court has construed Alaska's consumer protection statute (Alaska Stat. Ann. § 45.50.531(a)) to permit claims based on alleged antitrust and

33

monopolization conduct by indirect purchasers") (collecting cases); *Aggrenox*, 2016 WL 4204478, at \*7, 9 (dismissing indirect purchaser antitrust claims under South Carolina Unfair Trade Practices Act because "[t]he rule of *Illinois Brick* appears to control in South Carolina," and "[plaintiffs] have [not] offered any authority for the argument that the South Carolina Unfair Trade Practices Act can operate as a surrogate for antitrust law").

     b)  *States that bar consumer protection claims by entities.*

The named plaintiffs, who are not themselves consumers or individuals, bring their consumer protection claims on behalf of entities that "indirectly purchased and/or paid all or part of the purchase price" of the products at issue. EPP Compl. ¶¶14, 162. Four state consumer protection statutes only permit consumers to bring claims.

- **California**: *See Linear Tech. Corp. v. Applied Materials, Inc.,* 61 Cal. Rptr. 3d 221, 237 (Cal. Ct. App. 2007) ("[W]here a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks.").

- **Missouri**: *See In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, 2006 WL 2632328, at \*10 (E.D. Mo. Sept. 13, 2006) (private cause of action exists only for purchases related to "personal, family[,] or household purposes," not for "business purpose[s].") (quoting Mo. Ann. Stat. § 407.025); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1080 (S.D. Cal. 2017) (granting dismissal because indirect purchasers "have not pled the requisite household, personal, or family purposes" under Missouri law).

- **Montana**: *See* Mont. Code Ann. §§ 30-14-102(1) (defining a "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes"), -133(1)(a) (authorizing private causes of action for "consumer[s]"); *In re Lidoderm Antitrust Litig.*, 103 F. Supp. 3d 1155, 1165 (N.D. Cal. 2015) (dismissing Montana consumer protection claim brought by health plan because it did not qualify as a "consumer" under the statute); *Miami Prods. & Chem. Co.,* 546 F. Supp. 3d at 234–35 (dismissing Montana state consumer protection claim because indirect purchaser plaintiffs who purchase goods for "non-residential use" do not meet the statutory requirements).

- **Vermont**: *See Staley*, 446 F. Supp. 3d at 641–42 (dismissing claim because "the Vermont code specifies that it is only a consumer who may bring suit"); *Asacol*, 2016 WL 4083333, at \*15 (same); *Aggrenox*, 2016 WL 4204478, at \*9 ("The fact that Humana's members are consumers, and that Humana co-purchases or reimburses for consumer products that its members use, does not make Humana a consumer of those products"); *Solodyn*, 2015 WL

34

5458570, at *18 (dismissing Vermont state consumer protection claim where plaintiff failed to plausibly allege that the defendant sold "directly to consumers as required to fit Vermont's statutory definition of a seller").

        c)      *States that bar claims without sufficient intrastate conduct.*

EPPs plead, in entirely generic terms, that Defendants' conduct "deprived [Plaintiff and the Class] of the opportunity to purchase a less expensive [product] and forced [them] to pay higher prices," and then enumerates a list of state consumer protection statutes allegedly violated, without identifying any state-specific conduct occurring within those jurisdictions.  EPP Compl. ¶188(a)–(g).  These generalized allegations of nationwide conduct fail to meet the standard of the consumer protections statutes of **California** and **Florida**.  *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*; *Meridian Project Sys., Inc. v. Hardin Constr. Co., LLC*, 404 F. Supp. 2d 1214, 1225–26 (E.D. Cal. 2005) (dismissing California consumer protection claim because "no specific intrastate misconduct" was alleged and even if it was, they failed to "describe the who, what, where, when and how of counter-defendants' alleged intrastate misrepresentations");[13] Fla. Stat. § 501.204(1); *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1092–93 (D. Colo. 2018) ("[Plaintiff's] allegations do not state a claim under FDUTPA because they do not plausibly establish that the offending conduct took place *'predominantly or entirely'* in Florida" even though plaintiff had members in Florida) (internal citation omitted) (emphasis added).

      3.      **State Unjust Enrichment Claims**

        a)      *States that bar unjust enrichment claims by indirect purchasers.*

---

[13] *See also Aggrenox*, 2016 WL 4204478, at *7 ("This is an antitrust case, and California has antitrust law," and EPPs "offer no authority for the proposition that other provisions of California law besides its antitrust law can act as surrogates for antitrust law.").

As with both the state antitrust and consumer protection claims, *see supra* II(C)(1)(a) and (II)(C)(2)(a), certain states prohibit EPPs' unjust enrichment claims that are nothing more than an end-run around prohibitions on suits by indirect purchasers.

- **Alabama**: *See Loestrin*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Alabama law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes").

- **Florida**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Florida law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes"); *Lidoderm*, 103 F. Supp. 3d at 1175 (same); *In re Vascepa Antitrust Litig. Indirect Purchaser Plaintiffs*, 2023 WL 2182046, at *11 (D.N.J. Feb. 23, 2022) (same); *Seroquel XR*, 2022 WL 2438934, at *23–24 (same).

- **Illinois**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Illinois law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes"); *Lidoderm*, 103 F. Supp. 3d at 1175 (same); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 544–45 (E.D. Pa. 2010) ("Indirect purchaser class actions are precluded under the Illinois Antitrust Statute or under the ICFA" and "allowing Plaintiffs to recover through an unjust enrichment claim would undermine Illinois' legislative choices regarding antitrust law."); *Seroquel XR*, 2022 WL 2438934, at *23–24 (same).

- **Massachusetts**: *See Loestrin 24*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Massachusetts law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes"); *Lidoderm*, 103 F. Supp. 3d at 1175 (same); *Vascepa*, 2023 WL 2182046 (same), at *11 (same); *Seroquel XR*, 2022 WL 2438934, at *23–24 (same).

- **Missouri**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Missouri law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes"); *Vascepa*, 2023 WL 2182046, at *11 (same).

- **Pennsylvania**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Pennsylvania law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes"); *Stutzle v. Rhone-Poulenc S.A.*, 2003 WL 22250424, at *2 (Pa. Com. Pl. Sept. 26, 2003) ("[T]o allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by

36

Pennsylvania's antitrust law[] is not a proper use of the claim and can only lead to mischief").

- **Utah**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 381 (dismissing unjust enrichment claim under Utah law because "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes").

- **Puerto Rico**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 374, 381 ("Puerto Rico has not passed an *Illinois Brick*-repealer statute[,]" and "indirect purchasers may not bring state claims for unjust enrichment if they otherwise would be barred from bringing a claim under that state's antitrust and consumer protection statutes."); *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016) ("Absent an interpretation by the courts of Puerto Rico allowing antitrust recovery by indirect purchasers or an express *Illinois Brick* repealer statute enacted by the legislature, the Court concludes that EPP's indirect purchaser antitrust claim is barred in Puerto Rico and must be dismissed with prejudice.").

> b) *States that bar EPPs' claims for failure to plead a direct benefit conferred upon Novo Nordisk.*

EPPs plead that the indirect purchasers paid or reimbursed allegedly inflated prices to intermediaries in the distribution chain and that Novo Nordisk was enriched through downstream pass-through effects. EPP Compl. ¶¶8, 14, 151–153, 195–199. Where, as here, EPPs allege no direct transaction or relationship with Novo Nordisk that led to a direct benefit being conferred upon it, those unjust enrichment claims fail as a matter of law in several states.

- **Alabama**: *See Novartis & Par*, 2019 WL 3841711, at *6–7 (dismissing unjust enrichment claim because Alabama law "require[s] that a plaintiff confer a direct benefit on the defendant in order to recover under a theory of unjust enrichment"); *Cole v. NIBCO, Inc.*, 2015 WL 2414740, at *14 (D.N.J. May 20, 2015) (dismissing Alabama claim for lack of a "sufficiently direct relationship" because "Plaintiffs did not directly purchase the PEX Products from Defendant").

- **Florida**: *See Novartis & Par*, 2019 WL 3841711, at *6–7 (dismissing unjust enrichment claim because Florida law "require[s] that a plaintiff confer a direct benefit on the defendant in order to recover"); *Flonase*, 692 F. Supp. 2d at 544 (same); *Packaged Seafood Prods.*, 242 F. Supp. 3d at 1090 ("[T]he Florida Supreme Court explicitly acknowledged that 'to prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant.'" (quoting *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017))).

- **Kansas**: *See Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.,* 2015 WL 4755335, at *29 (N.D. Cal. Aug. 11, 2015) (Kansas law "require[s] plaintiffs to plead that they have conferred a direct benefit on the defendant" (alteration in original).

37

- **Maine**: *See Loestrin 24 FE*, 410 F. Supp. 3d at 384 (dismissing claim for failure to plead conferral of direct benefit); *Novartis & Par*, 2019 WL 3841711, at *6–7 (same); *Aftermarket Filters*, 2010 WL 1416259, at *3 ("Only the direct purchasers have conferred a direct benefit on defendants.").

- **Michigan**: *See Novartis & Par*, 2019 WL 3841711, at *7 (S.D.N.Y. Aug. 15, 2019) (dismissing unjust enrichment claim because Michigan law "require[s] that a plaintiff confer a direct benefit on the defendant in order to recover"); *Los Gatos Mercantile*, 2015 WL 4755335, at *29 (same); *Aftermarket Filters*, 2010 WL 1416259, at *3 ("Only the direct purchasers have conferred a direct benefit on defendants.").

- **New York**: *See Lidoderm*, 103 F. Supp. 3d at 1178 ("[T]ransactions and relationships between [] indirect purchaser plaintiffs and [] defendants" are "too attenuated to state an unjust enrichment claim under New York law." (quoting *Fenerjian v. Nongshim Co., Ltd.*, 72 F. Supp. 3d 1058, 1090 (N.D. Cal. Nov. 4, 2014))); *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007) (holding that the connection between the indirect plaintiffs and defendants in an antitrust action was "simply too attenuated" to support a claim for unjust enrichment).

- **North Carolina**: *See Aftermarket Filters*, 2010 WL 1416259, at *3 ("Only the direct purchasers have conferred a direct benefit on defendants."); *Hard Disk Drive Suspension Assemblies*, 2021 WL 4306018, at *28–9 (dismissing claim for failure to plead the conferral of a direct benefit).

- **North Dakota**: *See Novartis & Par*, 2019 WL 3841711, at *6–7 (dismissing unjust enrichment claim because North Dakota "require[s] that a plaintiff confer a direct benefit on the defendant in order to recover"); *Loestrin 24 FE*, 410 F. Supp. 3d at 384 (dismissing claim for failing to plead the conferral of a direct benefit).

- **Pennsylvania**: *See Cole*, 2015 WL 2414740, at *14 (dismissing Pennsylvania claim for lack of a "sufficiently direct relationship" because "Plaintiffs did not directly purchase the PEX Products from Defendant"); *Stutzle*, 2003 WL 22250424, at *1 ("Perhaps defendants appreciated the value of the benefits, but any unjust enrichment claim would belong to the direct purchasers, not to indirect purchasers such as plaintiffs.").

- **Rhode Island**: *See Novartis & Par*, 2019 WL 3841711, at *6–7 (Rhode Island "require[s] that a plaintiff confer a direct benefit on the defendant in order to recover"); *In re Refrigerant Compressors Antitrust Litig.*, 2013 WL 1431756, at *26 (E.D. Mich. Apr. 9, 2013) ("Any benefit that the [indirect purchaser] Plaintiffs conferred would be on others in the chain of distribution from whom they purchased, not on Defendants.").

- **Utah**: *See Aftermarket Filters*, 2010 WL 1416259, at *3 ("Only the direct purchasers have conferred a direct benefit on defendants."); *Pork*, 495 F. Supp. 3d at 796–97 ("A defendant is liable under the unjust enrichment prong of quantum meruit only if he or she received a direct benefit from the plaintiff." (quoting *Jones v. Mackey Price Thompson & Ostler*, 355 P.3d 1000, 1018 (Utah 2015))).

c)      *States that do not recognize unjust enrichment as an independent cause of action.*

EPPs assert unjust enrichment claims based on the same alleged overcharges and conduct underlying the antitrust and consumer-protection claims.  EPP Compl. ¶¶190–205.  But unjust enrichment is not recognized as a stand-alone cause of action or otherwise is unavailable in several states where the legislature has prescribed statutory standards and remedies.[14]

- **California**: *See Hard Disk Drive Suspension Assemblies*, 2021 WL 4306018, at *24 (dismissing unjust enrichment claim under California law because it is "duplicative" of another claim); *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) ("[P]laintiffs cannot assert unjust enrichment claims that are merely duplicative of statutory . . . claims."); *McBride v. Boughton*, 123 Cal. Rptr. 3d 115, 121 (Cal. Ct. App. 2004) ("Unjust enrichment is not a cause of action . . . but rather 'a general principle, underlying various legal doctrines and remedies.'" (cleaned up) (quoting *Melchior v. New Line Productions, Inc.*, 131 Cal. Rptr. 2d 347, 357 (Cal. Ct. App. 2003))); *In re Interior'l Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *22 (E.D. Va. Sept. 18, 2019) ("Unjust enrichment does not amount to an independent cause of action in California.").

- **Florida**: *See Licul v. Volkswagen Grp. of Am., Inc.*, 2013 WL 6328734, at *6 (S.D. Fla. Dec. 5, 2013) ("[W]here the unjust enrichment claim relies upon the same factual predicates as a plaintiff's legal causes of action, it is not a true alternative theory of relief but rather is duplicative of those legal causes of action.").

- **Mississippi**: *See Hard Disk Drive Suspension Assemblies*, 2021 WL 4306018, at *24 ("Under Mississippi law, 'unjust enrichment' is not itself a cause of action, but, rather, 'an equitable remedy closely associated with implied contracts and trusts.'") (quoting *In re Estate of Johnson v. Adkins*, 513 So. 2d 922, 926 (Miss. 1987)).

- **New Hampshire**: *See Gen. Insulation Co. v. Eckman Constr.*, 159 N.H. 601, 611 (2010) ("[U]njust enrichment generally does not form an independent basis for a cause of action.").

- **Wisconsin**: *See Frank v. Gold'n Plump Poultry, Inc.*, 2007 WL 2780504, at *11 (D. Minn. Sept. 24, 2007) ("Relief under the theory of unjust enrichment is not available

---

[14] Certain states also do not allow unjust enrichment claims when there is an adequate remedy at law.  *See, e.g.*, *N. Assur. Co. of Am. v. Bayside Marine Const., Inc.*, 2009 WL 151023, at *4 (S.D. Ala. Jan. 21, 2009) ("[T]he doctrine of unjust enrichment is an equitable remedy which issues only where there is no adequate remedy at law.").  EPPs expressly plead unjust enrichment in the alternative, so Defendants do not ask the Court at this time to dismiss any state law unjust enrichment claims on this ground but reserve the right to raise this issue at a later stage if necessary.

where . . . statutory standards for recovery are set by the legislature'"" (internal quotations omitted); *Ruediger v. Sheedy (In re Ruediger's Estate)*, 264 N.W.2d 604, 610 (Wis. 1978) ("Ordinarily, an aggrieved party must resort to a statutory remedy which was designed to redress a particular injury rather than to common law remedies.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaints with prejudice.

Dated: May 1, 2026

By: /s/ Andrew Lazerow

Andrew Lazerow (*pro hac vice*)
Ashley Bass (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Tel: (202) 662-6000
alazerow@cov.com
abass@cov.com

*Attorneys for Defendants Novo Nordisk Inc. and Novo Nordisk A/S*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Memorandum of Law contains 13,730 words and that it complies with the length restrictions in Local Civil Rule 7.1(c), as extended for this brief by the Court's April 23, 2026 Docket Entry Order.

/s/ Andrew Lazerow
Andrew Lazerow